**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Charles Donald CHORMAN,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**John L. ERDMAN, a/k/a Pops,
Defendant–Appellant.**

**Nos. 88–5640, 88–5641.**

United States Court of Appeals,
Fourth Circuit.

Argued March 8, 1990.

Decided July 31, 1990.

As Amended Sept. 19, 1990.

Samuel John Buffone, Asbill, Junkin, Myers & Buffone, Chartered, Washington, D.C., William Beverly Poff, Woods, Rogers & Hazlegrove, Roanoke, Va., argued (Henry W. Asbill, L. Barrett Boss, Asbill, Junkin, Myers & Buffone, Chartered, Washington, D.C., Frank K. Friedman, Woods, Rogers & Hazlegrove, Roanoke, Va., on brief), for defendants-appellants.

Douglas Cannon, Asst. U.S. Atty. argued (Robert H. Edmunds, Jr., U.S. Atty., Greensboro, N.C., on brief), for plaintiff-appellee.

Before PHILLIPS, SPROUSE, and CHAPMAN, Circuit Judges.

PHILLIPS, Circuit Judge:

Charles D. Chorman and John L. Erdman appeal from their convictions on multiple felony counts following their joint jury trial. Chorman and Erdman were indicted along with three other individuals and two corporations for conspiracy and substantive offenses arising from their involvement in

an automobile "salvage/switch" operation. The jury convicted both Chorman and Erdman of conspiracy; Chorman was also convicted on thirteen substantive counts and Erdman was convicted on eight substantive counts. On appeal, each raises several issues, principal among them sufficiency of the evidence, improper jury instructions, improper rebuttal argument by the prosecutor, and failure of the district court to set forth the factual basis for fines imposed. We find no merit in the appellants' challenge to their convictions and therefore affirm those convictions. We vacate the district court's imposition of fines, however, and remand for that court to make the requisite factual findings under 18 U.S.C. § 3572.

## I

Chorman and Erdman were charged along with Thomas Bosco, his brother John, and Howard Clinton McLaurin, Jr. in a 36–count indictment alleging involvement in an automobile "salvage/switch" operation. In a salvage/switch operation, the public vehicle identification number (VIN) from a salvage auto, usually purchased at an insurance company auction, is removed from the dashboard of the auto. Each automobile's VIN is unique, consisting of seventeen letters and numerals which identify, *inter alia*, the manufacturer, the make and model, and the year and plant of assembly. New title is obtained for the salvage vehicle, ostensibly after repairs have made it roadworthy. A car closely resembling the salvage auto is then stolen (or a stolen car resembling the salvage auto is already available), that car's public VIN is replaced with the salvage auto's public VIN, and the VINs located elsewhere on the stolen vehicle are obliterated or stamped over with the salvage auto's VIN.[1] The stolen car is finally sold as a legitimate used car with the new title.

The indictment charged in count one that the five named individuals, other unnamed

co-conspirators, Island Auto Wreckers, Inc. ("Island Auto"), a New York corporation that employed the appellants, and Thomas Bosco, and Silk Hope Automobile, Inc. ("Silk Hope"), McLaurin's Siler City, North Carolina, corporation, conspired to violate 18 U.S.C. § 2312 by transporting in interstate commerce vehicles known to have been stolen. *See id.* § 371. All the defendants were named in counts 2–26, which identified specific vehicles alleged to have been transported in interstate commerce knowing the same to have been stolen, in violation of *id.* §§ 2312 and 2. Counts 27–36 charged the defendants with knowingly removing or tampering with the VINs of ten identified vehicles, in violation of *id.* §§ 511(a) and 2.

The government first tried McLaurin after his severance motion was granted, and he was convicted on 35 of the 36 counts. Thomas and John Bosco pleaded guilty pursuant to plea agreements on the eve of trial. Erdman had also moved for severance before trial, but the court rejected his severance motion.

## II

Appellants' challenge to the sufficiency of the evidence in their trial necessitates a rather detailed review of the evidence presented. When a defendant challenges the sufficiency of the evidence used to convict him, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Our account of the evidence reflects that standard of review.

In its case-in-chief, the government's witnesses described the mechanics of a salvage/switch operation. The salvage autos were purchased by either Island Auto or Silk Hope to be "rebuilt" by the New York

---

1. An auto's full VIN is printed on the EPA sticker on the driver's side door, appears on the inside of the trunk lid, and may be concealed by assembly workers under the carpet, behind inte-

rior panels, or other places. Partial VINs are also stamped on the engine, transmission, and frame of the vehicle.

corporation. Erdman served as president of Island Auto while Chorman was identified as a buyer of salvage vehicles for the corporation. Once the "switch" had occurred with a stolen car, the stolen car with the salvage VIN and new title was sold by Island Auto to Silk Hope and transported to North Carolina. Government witnesses, often by way of stipulated testimony, traced all the stolen vehicles identified in the indictment through Island Auto and Silk Hope using the salvage auto VINs and the stolen vehicle VINs.

McLaurin testified for the government and explained the purported business relationship between Silk Hope and Island Auto. Silk Hope sold both salvaged auto parts and rebuilt vehicles. McLaurin said that he met Thomas Bosco in 1983 and the latter agreed to rebuild salvage cars for him. He saw Bosco frequently at salvage auctions, often in the company of Chorman, and though he never transacted business with Chorman, he assumed the two were partners. He did not know Erdman at all. If McLaurin bought the salvage auto, he paid Bosco only for "repair" work; if Island Auto bought the salvage auto, McLaurin would pay for the repair work and the auto itself.

McLaurin also explained his involvement with the ten cars identified in the VIN tampering counts. All of the cars involved had been sold by Island Auto to Silk Hope. McLaurin testified that he suspected that the cars might have been stolen and, identifying what he believed were altered VINs, attempted to reveal the original VINs by using a blow torch and acid. In the process, McLaurin completely obliterated the VINs on the ten vehicles.[2] The government charged that McLaurin, acting

in furtherance of the conspiracy, intentionally obliterated the VINs in an effort to impede its investigation.

The government's evidence also developed in depth the "paper trail" of the cars and the transactions between Island Auto and Silk Hope. Bills of sale, invoices, and other documentation were signed by McLaurin on behalf of Silk Hope and normally by Erdman (and occasionally by Thomas Bosco) on behalf of Island Auto. McLaurin, through Silk Hope, regularly paid for autos rebuilt by Island Auto by issuing a pair of checks, in identical amounts, both naming Thomas Bosco as payee. On other occasions McLaurin issued checks, again in identical amounts, to John Bosco and one Eddie Janis, who died during investigation of the case. The evidence showed that one of Chorman's relatives had second-endorsed and cashed out or deposited one of the duplicate checks from Silk Hope to Thomas Bosco.[3] The government also showed that Chorman and his wife, who negotiated as second endorser some of the Silk Hope checks to Thomas Bosco, opened a joint bank account in 1983, and that another account in Chorman's wife's name in trust for him was active from 1983 until 1986 or 1987. During the period of the conspiracy, Silk Hope issued well over $1,900,000 in checks to the coconspirators.

The government's theory was that Chorman was the "silent partner" in Island Auto,[4] and to support that theory the government introduced testimony from Joel Denson regarding his past transactions with Chorman. Over defense objection, Denson testified that he sold cars for Chorman around 1983–1984.[5] He original-

2. Government investigators testified that they do use heat and acid in the attempt to reveal auto VINs that have been covered or ground down. The investigators were noticeably more successful in their efforts to reveal the underlying VINs than was McLaurin.

3. Chorman's future mother-in-law, for example, second-endorsed and negotiated over $159,000 in checks made out to Thomas Bosco.

4. The indictment charged that

[i]t was further a part of the Conspiracy that CHARLES DONALD CHORMAN, in order to conceal his central role in the Conspiracy, would and did seek to keep his name from appearing on corporation documents, bills of sale, invoices, bank accounts, checks, licenses, registrations, and other documents relating to the purchase, rebuilding or sale of motor vehicles.

5. Though the basis of the district court's ruling is not entirely clear, the court did indicate that it would limit the evidence to acts occurring in

ly believed that Chorman had purchased the cars at salvage auctions, but he became suspicious that the cars might have been stolen. He confronted Chorman, who admitted that the particular car in question had been stolen; Denson agreed to sell the car anyway and Chorman agreed to double his commission. Denson eventually was convicted on state auto theft charges involving two other cars he obtained from Chorman.[6]

The government bolstered its "silent partner" theory by introducing the testimony of NYPD officer Joseph Bodnar that when Chorman was arrested he indicated that "North Carolina doesn't have anything on me." Chorman inquired about the number of cars involved and when Bodnar told him that over one hundred cars were involved, Chorman's response was that "my name is on nothing."

IRS agent Lawrence Egan served a subpoena on Island Auto as part of the government's investigation. When Egan asked Erdman, who had identified himself as the president of the corporation, to produce the subpoenaed records, Erdman twice looked to Chorman, who was present along with Thomas Bosco, and asked what he should do. Egan also testified regarding conversations that ensued.

Mr. Erdman indicated that he was the president of Island Auto Wreckers, that Charles Chorman and Tommy Bosco were employees of his, that they were— that he handled all the financial records of the corporation, that Charles Chorman and Tommy Bosco bought and sold the cars, bought and sold parts. At this time Mr. Chorman indicated that—or stated that he had applied for a license to be the president of Island Auto Wreckers, he was denied the license, and that he had asked Mr. Erdman to be the president of Island Auto Wreckers.

Joint Appendix (J.A.) at 681.

Egan also testified respecting the records he obtained at Island Auto. He reported that Island Auto had second-endorsed and deposited a $7000 check from Silk Hope to Thomas Bosco on October 1, 1985. On that same date, Erdman wrote a check to "Cash" in the amount of $7000, noting in the company's check register: "Wash, Bosco, Silk Hope." The court ruled inadmissible Egan's proffered explanation that "wash" in that context meant "to conceal or hide a transaction."

After the close of the government's case-in-chief, both Chorman and Erdman moved for judgment of acquittal under Fed.R. Crim.P. 29(a). The district court denied the motion with respect to the conspiracy count, but took the motion under advisement with respect to the substantive counts.

The defense's principal witness was Erdman. Erdman testified that he served as the "titular" head of Island Auto, consistent with the government's theory that he acted as the "front" for the illegal operations. Erdman had served in a similar capacity for another company whose principal was a business acquaintance of Thomas Bosco.[7] He obtained employment at Island Auto through Thomas Bosco. He handled the bookkeeping and paperwork for the company and applied for necessary licenses. Only a short time after he started at Island Auto, a special stockholders meeting was held and Erdman was made the sole member of the board of directors, president, vice-president, secretary, treasurer, and sole stockholder. According to Erd-

---

or after 1983 in furtherance of the conspiracy to transport stolen vehicles in interstate commerce. Alternatively, the court at least impliedly ruled that the evidence could be admitted against Chorman as proof of a common plan or scheme under Fed.R.Evid. 404(b).

6. Following Denson's testimony, in which he stated that he had met Erdman but never done business with him, Erdman renewed his motion for severance, claiming undue prejudice by association. The motion was denied.

7. Joel Denson had earlier testified that he sold cars for Charles Kemler, the principal in the erstwhile Erdman Motors. Erdman elaborated on the relationship between Denson and Kemler and also revealed that Kemler and Thomas Bosco had been friends since childhood. Erdman also testified that Kemler purchased from Island Auto the vehicle identified in overt act 15 of the indictment.

man, Bosco ran the operations at the salvage yard; Chorman was also active in duties at the yard and served as a buyer for the company at salvage auctions.

Erdman admitted that Island Auto paid Chorman and Thomas Bosco equal salaries. He also testified that Bosco regularly "skimmed" daily sales receipts from the yard. Other lax business and accounting practices at Island Auto were revealed. Erdman acknowledged that "no-show" employees, the wives of Chorman and Bosco, were kept on the books and paid regular salaries. Erdman also admitted cashing out the $7000 check from Silk Hope to Bosco by depositing the check in Island Auto's bank account and immediately issuing a check in the same amount for "cash." He also cashed several company checks made out to "cash," allegedly to obtain petty cash to run the business. Finally, Erdman acknowledged that sales of the four cars identified in counts 2, 5, 7, and 8 of the indictment did not appear in Island Auto's financial records. The profits from those sales from Island Auto to Silk Hope were "off the books," according to Erdman.

At the close of all evidence, appellants renewed their motions for acquittal under Fed.R.Crim.P. 29(a). The court ruled as it had at the close of the government's case, denying the motions with respect to the conspiracy count and taking those respecting the substantive counts under advisement.

Closing arguments followed. In rebuttal closing, the government emphasized its theory that Erdman was the knowing front for the illegal operations, and Chorman the silent partner. In one passage, the prosecutor alluded to Agent Egan's testimony.

> Let's go to John Erdman. I think Mr. Erdman is kind of tragic. For most of his adult life, he apparently was gainfully employed. Because he had a clean background, he was able to get licenses. But then—but then he agreed to be a front. He agreed to be a front for this Kemler fellow in Erdman Motors in New Jersey for a couple of years, and then he agreed to be a front—by his testimony

> yesterday—for Tommy Bosco. Of course, you may recall that when Larry Egan went to Island Auto Wreckers as a part of the investigation, Charles Chorman at that interview said, "This would have been my business. I couldn't get a license." John Erdman is educated; used words like "titular," and what he means to say, of course, is "front." He's knowledgeable about what's going on there at Island Auto Wreckers.

*Id.* at 972. Although on other occasions before and after this part of the summation defense counsel objected, objection to this passage was made only after the summation was concluded. Defense counsel asked for a curative instruction, but the court indicated that it found the summation unobjectionable and further believed that an instruction would be detrimental to the defense by calling unnecessary attention to the challenged comments. The court gave defense counsel the option of presenting a proposed curative instruction, which the court said it would consider giving to the jury, but defense counsel chose not to exercise this option.

The court then instructed the jury. After instructing on the conspiracy charge itself, the court instructed the jury on the ramifications of finding a conspiracy.

> Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed and that a defendant was one of the members, then the statements thereafter knowingly made and the acts thereafter knowingly done by any person likewise found to be a member may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the statements and the acts may have occurred in the absence of and without the knowledge of the defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy and in furtherance of some object or purpose of the conspiracy.

*Id.* at 1001. The court then identified the elements for conviction under 18 U.S.C. § 2312 for interstate transportation of ve-

hicles known to have been stolen. The court told the jury that "[p]ossession of property recently stolen, if not satisfactorily explained, is ordinarily a circumstance from which the jury may reasonably draw the inference and find in light of the surrounding circumstances shown by the evidence in the case that the person in possession knew the property had been stolen." *Id.* at 1008–09. Chorman's counsel had objected to this instruction at the charge conference.[8] Following the possession instruction, the court reminded the jury that the law never imposes on a defendant the burden of testifying, and possibly explaining possession, and that it is the jury's province to draw or reject any inference from possession. The court then gave the instruction that knowledge may be inferred from "willful blindness," and a charge that the guilt of an accused may be established under aiding and abetting principles.[9]

The jury found Chorman guilty on the conspiracy count, eleven of the fifteen interstate transportation of stolen vehicle counts, and two of the ten VIN alteration counts. The jury convicted Erdman on the conspiracy count, seven interstate transportation counts, and one VIN count. The court sentenced Chorman to five years on the conspiracy count and ordered him to pay a $200,000 "committed" fine. Combined with sentences for the other counts ordered to be served consecutively to the conspiracy sentence, Chorman's total term of imprisonment was set at twelve years and four months. Erdman was sentenced to three years on the conspiracy count and fined $100,000; the court consolidated sentences on the other counts and added one additional year to the term of imprisonment, to be served consecutively, for a total sentence of four years. The court did not set forth a factual basis for imposing the fines.

This appeal followed.

### III

Chorman and Erdman each raise numerous issues, though several of their arguments are related to a basic sufficiency of the evidence challenge. Both contend that the government presented insufficient evidence to prove "guilty knowledge" on any count charged in the indictment. They do not directly challenge the evidence of the existence of a conspiracy; rather, they contend that there was insufficient proof of their knowledge of and participation in the conspiracy. They further argue that the government presented no evidence that either appellant stole, possessed, or transported any stolen vehicle identified in the indictment, or tampered with the VIN of any vehicle identified in the indictment. Anticipating the government's reply that convictions on the substantive counts can

8. Chorman's counsel stated:

Regarding possession of property recently stolen. It seems to the defendant Chorman, there's no evidence of his actual possession of stolen property in this case; not like there was in the case of the companion matter, Mr. McLaurin.... If you're inclined to give the charge that the government asks for regarding possession of property recently stolen, we would then ask for an instruction that marshalling the evidence, or in this particular instance the lack of evidence, and state to this jury that there is no evidence that at any time Mr. Chorman possessed a vehicle alleged to have been stolen which is charged in the indictment.

J.A. at 763–64.

9. The court charged:

The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him.

A finding beyond a reasonable doubt of a *conscious purpose to avoid enlightenment* would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact. It is entirely up to you as to whether you find any deliberate closing of the eys [sic], and the inference to be drawn from any such evidence. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge.

The guilt of an accused in a criminal case may be established without proof that he personally did every act constituting the offense alleged. The law recognizes that ordinarily anything a person can do for himself may also be accomplished by him through direction of another person as his agent, or by acting in concert with, or under the direction of another person or persons in a joint effort or enterprise.

J.A. at 1010–11.

be sustained under the *Pinkerton* doctrine,[10] they claim that the court did not give a proper *Pinkerton* charge. They also challenge other jury instructions, arguing that the jury's convictions on the substantive offenses can be traced to erroneous instructions. Specifically, they charge that the court erred by failing to define "possession" in the context of the interstate transportation of stolen vehicles charges, and compounded that error by immediately following the possession instruction given with willful blindness and aiding and abetting instructions they claim misled the jury.

Chorman argues that the government's rebuttal closing impermissibly alluded to his prior criminal record and therefore prejudiced his right to a fair trial. Erdman also claims prejudice from the government's closing through guilt by association. He extends that argument in asserting that the district court committed reversible error by denying his severance motion. Finally, both appellants argue that the district court erred by failing to set forth the factual basis for the fines it imposed.

### A

We address first the sufficiency of the evidence challenge to the conspiracy convictions, assessing the evidence in the light most favorable to the government, *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789, and of course considering both direct and circumstantial evidence. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

Appellants were charged under 18 U.S.C. § 371[11] with conspiring to commit federal crimes, specifically the interstate transportation of motor vehicles known to have been stolen. In order to prove the existence of a conspiracy in violation of § 371, the government must prove an agreement between two or more persons to act together in committing an offense and an overt

act in furtherance of the conspiracy. *See, e.g., United States v. Reifsteck*, 841 F.2d 701, 704 (6th Cir.1988). There must be some showing that the defendant knew the conspiracy's purpose and took some action indicating his participation. *United States v. Laughman*, 618 F.2d 1067, 1075 (4th Cir.1980). "A tacit or mutual understanding between or among the alleged conspirators is sufficient to show a conspiratorial agreement." *United States v. Reifsteck*, 841 F.2d at 704. A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan. *Id.* " 'Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight*, is sufficient to convict him with knowing participation in the conspiracy.' " *United States v. Laughman*, 618 F.2d at 1076 (quoting *United States v. Dunn*, 564 F.2d 348, 357 (9th Cir.1977)) (emphasis in original).

The government's evidence sufficiently established the existence of the conspiracy to transport stolen vehicles and linked Chorman with the conspiracy. The concerted action between the Boscos in New York and McLaurin in North Carolina was clearly established. No direct evidence tied Chorman to this conspiracy—in his words, his name was not on anything. But the government's circumstantial proof validated its "silent partner" theory. Chorman was an active buyer for Island Auto and often accompanied Thomas Bosco to salvage auctions. McLaurin believed Chorman was Thomas Bosco's partner, a belief that was consistent with Island Auto's payment of equal salaries to the two. The duplicate checks from Silk Hope to Thomas Bosco allow the inference of a transparent attempt to pay a silent partner. That Chorman was the silent partner was shown

---

**10.** *See Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

**11.** "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency

thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both." 18 U.S.C. § 371.

through evidence of negotiation of numerous Silk Hope checks by Chorman's relatives. When confronted by Agent Egan's request for company documents, Erdman looked not to Thomas Bosco but to Chorman for advice. Denson's testimony, which we agree was admissible under Fed. R.Evid. 404(b), indicated Chorman's earlier involvement in a similar salvage/switch scheme. From all this evidence the jury rationally could have concluded that Chorman was a knowing and active participant in the conspiracy.

The government aptly characterized Erdman's role as that of a "front" for the illegal operations. The evidence showed that Erdman had a past association with a similar operation and a significant role in Island Auto's business. He signed papers for the company, applied for licenses, and kept all the books. On behalf of Island Auto he signed sales documents for some of the cars identified in the indictment. On at least one occasion he cashed out a check from Silk Hope to Thomas Bosco and listed it as a "wash." He admitted that he did not record in the company's books Island Auto's sales to Silk Hope of the cars in counts 2, 5, 7, and 8. From this evidence the jury could have concluded beyond a reasonable doubt that he was aware of the conspiracy's purpose and his actions furthered that purpose.[12]

### B

We next address the sufficiency of the evidence to convict on the substantive counts, charging violations of 18 U.S.C. §§ 2312 and 511(a). Section 2312 prohibits "transport[ing] in interstate or foreign commerce a motor vehicle or air-craft, knowing the same to have been stolen." Conviction under this statute requires proof that there was a stolen vehicle, that the defendant knew the vehicle was stolen, and that the defendant transported the vehicle in interstate commerce. See, e.g., United States v. Spoone, 741 F.2d 680, 686 (4th Cir.1984). Section 511(a) prohibits a person from "knowingly" removing, obliterating, tampering with, or altering an identification number for a motor vehicle or motor vehicle part. "Knowingly" in this context means only "knowing action" by the defendant. See United States v. Enochs, 857 F.2d 491, 492–93 (8th Cir.1988).

To sustain the appellants' convictions on these counts against their challenge of insufficiency of the evidence, the government relies on application of the accomplice-liability principles of Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). In Pinkerton, the Court held that where substantive offenses have been committed by a coconspirator in furtherance of a proven conspiracy, fellow conspirators can be found guilty on that basis of the substantive offenses. 328 U.S. at 646–47, 66 S.Ct. at 1183–84; see also Nye & Nissen v. United States, 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949) ("We held [in Pinkerton] that a conspirator could be held guilty of the substantive offense even though he did no more than join the conspiracy, provided that the substantive offense was committed in furtherance of the conspiracy and as a part of it."). Federal courts consistently have followed Pinkerton in affirming convictions for substantive offenses committed in the course of and in furtherance of a conspiracy, based on the defendant's knowledge of and

12. Appellants contend that the district court erred when it reserved ruling on their Rule 29(a) motions for acquittal made at the close of the government's case. Erdman especially complains, arguing that the court's indecision effectively forced him to testify. We agree that it is error for the court to take under advisement a defendant's Rule 29(a) motion made at the close of the government's affirmative case, though that error is harmless if the evidence, viewed in the light most favorable to the government, was sufficient to take the case to the jury. See United States v. Reifsteck, 841 F.2d at 703. In this case, however, the court denied the motion with respect to the conspiracy count, taking under advisement the motions respecting the other counts. We think the government presented sufficient evidence in its case-in-chief of Chorman's and Erdman's complicity in the conspiracy to take the case to the jury on the conspiracy counts and therefore need not decide whether evidence presented during the defense's case may be considered in evaluating the sufficiency of the evidence in a case like this one.

participation in that conspiracy. *See, e.g., United States v. Alvarado,* 898 F.2d 987, 993 (5th Cir.1990); *United States v. LeFaivre,* 507 F.2d 1288, 1298–99 (4th Cir. 1974).

Proper application of the *Pinkerton* theory depends on appropriate instructions to the jury. *See Nye & Nissen v. United States,* 336 U.S. at 618, 69 S.Ct. at 769; *see also United States v. Basey,* 816 F.2d 980, 998 (5th Cir.1987). Some circuits have approved instructions that state "clearly that the defendant can be convicted of a substantive crime committed by his coconspirator in furtherance of the conspiracy." *See United States v. Manzella,* 791 F.2d 1263, 1268 (7th Cir.1986); *see also United States v. Vasquez,* 858 F.2d 1387, 1393 n. 3 (9th Cir.1988).[13] Other courts have found the *Pinkerton* principle fairly expressed in instructions that acts and statements of coconspirators done or made during the course of and in furtherance of a conspiracy may be considered as evidence against another member of the conspiracy. *See United States v. Acosta,* 763 F.2d 671, 681–82 & n. 7 (5th Cir.1985); *United States v. Gallo,* 763 F.2d 1504, 1520 n. 23 (6th Cir.1985); *see also United States v. Molina,* 581 F.2d 56, 60 n. 7 (2d Cir.1978).

■ The district court in this case charged the jury that once it had found

beyond a reasonable doubt that a conspiracy existed and that a particular defendant was one of its members, it could consider as evidence against that defendant acts and statements done or made by another likewise found to have been a member of the conspiracy, provided that such acts and statements were done and made in the continuance and in furtherance of the conspiracy. This court has not had to resolve the question of proper *Pinkerton* instructions, but we believe that the court's instructions here fairly expressed the *Pinkerton* principle.[14] Though the instructions approved in some other circuits have the virtue of concretely stating the *Pinkerton* rule that a conspirator may be convicted of substantive offenses committed by coconspirators in the course of and in furtherance of the conspiracy, the court's instruction in this case is unassailable as a matter of law. *See Pinkerton,* 328 U.S. at 646–47, 66 S.Ct. at 1183–84 ("It is settled that 'an overt act of one partner may be the act of all without any new agreement specifically directed to that act.' ") (quoting *United States v. Kissel,* 218 U.S. 601, 608, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (1910)). We agree with those courts that have approved similar instructions and hold that the district court's instruction adequately expressed the *Pinkerton* principle. *See United States v. Acosta,* 763 F.2d at 681 n. 7.[15]

---

**13.** This is substantially the "Guilt of Substantive Offense" instruction in Devitt and Blackmar.

If you find that a particular defendant is guilty of conspiracy as charged in Count I, you may also find that defendant guilty of a substantive offense as charged in any other count of the indictment, provided that you find that the essential elements of that count as defined in these instructions have been established beyond a reasonable doubt, and provided that you also find beyond a reasonable doubt,

First, that the offense defined in the substantive count was committed pursuant to the conspiracy, and

Second, that the particular defendant was a member of the conspiracy at the time the substantive offense was committed.

Under the conditions just defined a defendant may be found guilty of a substantive count even though he did not participate in the acts constituting the offense as defined in the substantive count. The reason for this is that a coconspirator committing a substantive offense pursuant to a conspiracy is held to be the agent of the other conspirators.

2 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions: Civil and Criminal* § 27.17 (3d ed. 1977) (quoted in *United States v. Basey,* 816 F.2d at 998 n. 35).

**14.** We note that appellants did not object to the court's instruction. As we find no error in the instruction, it obviously was not plain error to instruct the jury in this manner. *See* Fed.R. Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

**15.** The instruction in *United States v. Acosta* is almost exactly the same as the instruction given in this case.

Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed, and that a defendant was one of the members, then the statements knowingly made thereafter and the acts knowingly done thereafter, by any person

■ Applying the *Pinkerton* theory, we hold that the government presented substantial evidence of acts committed by the coconspirators sufficient to establish all the necessary elements for conviction under § 2312 and § 511(a). The government's proof established the existence of stolen vehicles and transportation of stolen vehicles between Island Auto in New York and Silk Hope in North Carolina, and otherwise in interstate commerce. Ample circumstantial evidence supported the conclusion that the coconspirators knew the vehicles had been stolen. McLaurin's testimony alone was sufficient to establish the elements of the VIN tampering charges. Once the jury found, based on evidence that we have concluded was sufficient for conviction, the existence of a conspiracy and the knowing participation of Chorman and Erdman in that conspiracy, it could under the court's instruction have considered all the evidence against all the coconspirators on the substantive charges. The criminal intent to commit the substantive offenses was "established by the formation of the conspiracy." *Pinkerton*, 328 U.S. at 647, 66 S.Ct. at 1184. The evidence was more than sufficient to convict Chorman and Erdman on the substantive charges.

Conviction for substantive violations of 18 U.S.C. §§ 2312 and 511(a) under the *Pinkerton* theory is appropriate though the indictment charged specifically that the object of the conspiracy was the interstate transportation of motor vehicles knowing the same to have been stolen. *See United States v. Alvarez*, 755 F.2d 830, 850 & nn. 24 & 25 (11th Cir.1985). McLaurin's obliteration of the salvage VINs on the ten identified "switch" vehicles, though perhaps not an anticipated act, nevertheless was certainly in furtherance of the conspiracy's purposes. And we cannot say that attributing the VIN tampering counts to Chorman and Erdman was so attenuated as

to run afoul of possible due process limitations on the *Pinkerton* doctrine. *See United States v. Johnson*, 886 F.2d 1120, 1123 (9th Cir.1989); *United States v. Alvarez*, 755 F.2d at 850–51.

Appellants' related contention that the inconsistency of the guilty verdicts rendered on the substantive counts in this case is incompatible with imposition of liability under the *Pinkerton* theory also fails. In *Pinkerton* itself, the Court affirmed the conspirators' convictions on nine and six substantive counts, respectively. *See id.* 328 U.S. at 641, 646–47, 66 S.Ct. at 1181, 1183–84; *see also United States v. Johnson*, 730 F.2d 683 (11th Cir.1984).

C

■ Again beginning with the contention that there was no direct evidence that they knew that the vehicles charged under the § 2312 counts were stolen, appellants challenge the court's instructions for that offense. Appellants agree that the instructions given in and of themselves are legally sound. But they argue that the district court's possession instruction was inadequate in that it failed to define "possession" or differentiate actual and constructive possession. *See United States v. Ashley*, 587 F.2d 841, 844–45 (6th Cir.1978). When followed in short order by a willful blindness instruction, appellants argue that the instructions permitted the jury, piling inference upon inference, to find the critical element under § 2312 of knowledge that the vehicles were stolen not from the factual predicate of possession of recently stolen property, but from conscious ignorance of that fact. Indeed, willful blindness would not support a finding of actual or constructive possession, *see United States v. Astorga–Torres*, 682 F.2d 1331, 1337 (9th Cir.1982), and willful blindness to actual possession of property recently stolen would not support a finding of knowledge that the property was stolen.

---

likewise found to be a member, may be considered by the jury as evidence in the case as to any defendant found to have been a member, even though the statements and acts may have occurred in the absence and without the knowledge of the defendant, provided such

statements and acts were knowingly made and done during the continuance of such conspiracy, and in furtherance of some object or purpose of the conspiracy.

763 F.2d at 681 n. 7.

But appellants' arguments fail in the light of the evidence presented and *Pinkerton* principles. All the evidence of possession of recently stolen autos by members of the conspiracy, from which the jury could infer knowledge that the autos were stolen, could have been considered by the jury as evidence against Chorman and Erdman. Appellants concede that the evidence of Thomas Bosco's actual possession of stolen vehicles was at least "relatively strong," to say nothing of the evidence of possession by Island Auto, Silk Hope, and McLaurin. There was no need for the government to prove actual or constructive possession by Chorman or Erdman when the evidence clearly showed actual possession of recently stolen property by other members of the conspiracy. *See United States v. Alvarado*, 898 F.2d at 993; *United States v. Moreno*, 588 F.2d 490, 493 (5th Cir.1979). The court did not err in instructing the jury as it did. *Cf. United States v. Ashley*, 587 F.2d at 843–45 (no conspiracy alleged; insufficient evidence of actual possession by one defendant).

### D

■ Chorman alleges that the prosecutor committed prejudicial error by alluding to his past criminal record in his rebuttal argument. We have stated that "[t]he test for reversible prosecutorial misconduct generally has two components: that '(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.'" *United States v. Brockington*, 849 F.2d 872, 875 (4th Cir.1988) (quoting *United States v. Hernandez*, 779 F.2d 456, 458 (8th Cir.1985)). Several factors are relevant to the determination of possible prejudice to the defendant: "(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the

remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters." *United States v. Harrison*, 716 F.2d 1050, 1052 (4th Cir.1983).

■ Chorman claims that the prosecutor contrasted Erdman's "clean background" and his ability to obtain licenses necessary to run the salvage operation with Chorman's admitted inability to obtain the licenses, strongly implying that he lacked Erdman's clean background. This statement, he contends, would be recognized by the jury as a veiled reference to a past criminal record.[16] The prejudicial effect of references to a defendant's past criminal record is well recognized. *See, e.g., United States v. Esquer–Gamez*, 550 F.2d 1231, 1234 (9th Cir.1977). Chorman relies on *United States v. Freeman*, 598 F.2d 306, 307–08 (D.C.Cir.1979) (per curiam), for the proposition that reference to a defendant's "background" is prejudicial error. And he emphasizes that inclusion of the remarks in the prosecution's rebuttal closing magnified the prejudicial effect of the remarks since the defense had no further opportunity to respond. *Cf. United States ex rel. Shaw v. De Robertis*, 755 F.2d 1279, 1284–85 (7th Cir.1985) (fact that prosecutor made challenged remark during rebuttal closing part of "totality of the circumstances" considered by the court in finding prejudicial error).

We disagree with Chorman's initial premise that the prosecutor's comments were improper. We find no improper reference to Chorman's past criminal record; consequently, the remarks challenged here fail the first prong of the *Brockington* test. *United States v. Freeman* is inapposite when there is no reference to the defendant's "background." Erdman was the focus of the argument at that point, which was consistent with the government's theory that he acted as a "front" for the illegal

**16.** Chorman's prior conviction, dating from 1973 and thus more than ten years before this trial began, would have been admissible under Fed.R.Evid. 609(b) only if the court had determined that "in the interests of justice, ... the probative value of the conviction supported by specific facts and circumstances substantially outweigh[ed] its prejudicial effect."

operations. Erdman admitted that one of his principal functions at Erdman Motors and at Island Auto was to obtain necessary licenses. The prosecutor fairly paraphrased Agent Egan's testimony in support of this theory. Chorman's attempt to find allusion to his past criminal record by juxtaposing Erdman's "clean background" and the reference that Chorman could not get a license is not persuasive.

### E

Erdman's contention that the district court erred in failing to grant his motion to sever is similarly without merit. Under Fed.R.Crim.P. 14, the court may grant a severance if it appears that a defendant is "prejudiced" by a joinder of offenses or of defendants. Barring "special circumstances," the general rule is that defendants indicted together should be tried together. *United States v. Brugman*, 655 F.2d 540, 542 (4th Cir.1981). Joinder is highly favored in conspiracy trials. *See United States v. Tedder*, 801 F.2d 1437, 1450 (4th Cir.1986). The district court's decision to grant or deny a motion for severance will be overturned only for a clear abuse of discretion. *Person v. Miller*, 854 F.2d 656, 665 (4th Cir.1988). "Such an abuse of discretion will be found only where the trial court's decision to deny a severance 'deprives the defendant[ ] of a fair trial and results in a miscarriage of justice.' " *Id.* (quoting *United States v. Becker*, 585 F.2d 703, 706 (4th Cir.1978)).

 The district court did not abuse its discretion in refusing to sever Erdman from the case. The relative strength of the government's case against individual defendants is no basis for severance in the absence of a strong showing of prejudice. *See United States v. Brugman*, 655 F.2d at 543. The prejudice Erdman claims to have suffered allegedly arose principally from the admission of Joel Denson's testimony. The court, however, exercising its discretion to the benefit of appellants, limited Denson's testimony to acts occurring in or after 1983. We can assume that this evidence was admissible only against Chorman, so that a limiting instruction would

have been proper, but Erdman did not move the court for such an instruction. *See* Fed.R.Evid. 105 (court "upon request" shall restrict evidence to its proper scope and instruct jury accordingly); *see also United States v. Gilmore*, 730 F.2d 550, 555 (8th Cir.1984); *United States v. Regner*, 677 F.2d 754, 757 (9th Cir.1982). More importantly, it is apparent from the verdicts that the jury was independently weighing the evidence against each defendant. *See United States v. Porter*, 821 F.2d 968, 972 (4th Cir.1987). Erdman's showing of prejudice is inadequate; the court did not abuse its discretion in denying his motion to sever.

### IV

 Finally, appellants assign as error the district court's failure to make factual findings on the record in connection with the fines it imposed. Section 3572(a) of title 18 provides that "[i]n determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine, the court *shall* consider, in addition to the factors set forth in section 3553(a)" seven enumerated factors. 18 U.S.C. § 3572(a) (emphasis added). This court has now held in *United States v. Harvey*, 885 F.2d 181 (4th Cir.1989), that the district court must make specific fact findings on these factors in order to permit effective appellate review of the court's action. We vacated the district court's denial of a motion for reduction in fine under former Fed.R.Crim.P. 35 in that case and remanded for the district court to make findings on the record respecting the challenged fine. 885 F.2d at 182–83.

The district court in this case failed to make the requisite factual findings under § 3572(a). The government concedes the court's failure to make factual findings as required by *Harvey*, but argues that appellants prevented the court from making such findings by failing to present adequate financial information. Chorman apparently did not submit a financial questionnaire to the court, but he argued to the district court that all requested financial information had been submitted. The pro-

bation report for Chorman also states that he was "cooperative" in providing requested financial information. In any event, though the district court alluded to the meagerness of the information before it, nothing in the record indicates that the court justified its failure to discuss the factors in § 3572(a) on that basis. We believe that remand is required to enable the district court to make findings on the record that would in turn enable this court to effectively review any fine ultimately imposed.

## V

For the foregoing reasons, we affirm appellants' convictions. We vacate the district court's imposition of fines and remand that portion of the case to the district court with instructions to make factual findings on the record as required by 18 U.S.C. § 3572(a) and *United States v. Harvey*.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.