**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-4907

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DERRICK ANTHONY TIMMONS, a/k/a Red,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (CR-05-19)

Argued: March 16, 2007                    Decided: May 1, 2007

Before WILLIAMS, KING, and DUNCAN, Circuit Judges.

Affirmed by unpublished opinion. Judge Duncan wrote the opinion, in which Judge Williams and Judge King concurred.

**ARGUED:** Alan Hideto Yamamoto, Alexandria, Virginia, for Appellant. Owen Matthew Kendler, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, G. David Hackney, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

Appellant Derrick Anthony Timmons ("Timmons") was charged together with Preston Cornelius Everett ("Everett") in a two-count superseding indictment for conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846, and for possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Just prior to the beginning of Timmons's and Everett's joint trial, Timmons's counsel was dismissed because of a conflict of interest. The trials were severed to allow Timmons an opportunity to obtain court-appointed trial counsel. A jury convicted Timmons of both counts, and the district court sentenced him to 300 months' imprisonment, 10 years' supervised release, and a $200 special assessment. Timmons now appeals his convictions and his sentence. For the reasons discussed below, we affirm.

I.

According to the evidence adduced at trial,[1] the charged conspiracy began in 2003 when Timmons and Everett began purchasing cocaine from Adrian Adkins ("Adkins"). Adkins testified that he had supervised eight drug deliveries from "Chico," a supplier in

---

[1]The facts are presented in the light most favorable to the government. See United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir. 1997) (recounting the standard governing appellate review of a challenge to the sufficiency of the evidence to support a conviction).

Texas, to Timmons and Everett in Virginia. Early in the conspiracy, the three would hide the cocaine in Everett's house while Timmons and Everett arranged for its resale. Following an altercation between Everett and his girlfriend involving the use of firearms, Chico directed the three to begin storing the cocaine in Timmons's house. Adkins also testified that he witnessed Timmons cutting the cocaine into smaller units for resale. Finally, Adkins and another supervisor known as "Primo" would allow Timmons and Everett to distribute the cocaine piecemeal on credit, paying for each portion before receiving the next to sell.

The Drug Enforcement Administration (the "DEA") infiltrated Chico's drug ring when a Confidential Informant (the "CI") was hired to transport cocaine from Chico to Adkins. In mid-October, 2004, a man calling himself "Mario" called the CI and asked him to drive an automobile containing a shipment of cocaine from Dallas, Texas to Virginia. The CI met Primo in a parking lot in Dallas, where he received cash, a telephone, and an automobile. The numbers of Mario, Primo, and Chico were stored in the telephone's contacts list. Before driving the vehicle to Virginia, the CI met with DEA officials, who searched the vehicle and found eleven kilograms of cocaine hidden inside. During the CI's drive to Virginia, Mario called and directed him to rent a hotel room at a particular Best Western location in Virginia. Around that time, Chico directed Adkins to meet the CI at the Best Western to pick up

3

the vehicle. Chico asked Adkins to deliver the cocaine to Timmons and Everett, to collect payment they owed on a past cocaine shipment,[2] and to send the car back with the money via the CI.

Adkins was arrested by DEA agents at the Best Western after he completed the transaction with the CI. After meeting with the agents, Adkins agreed to cooperate. At the agents' behest, Adkins called both Everett and Timmons, arranging to meet the former at the Best Western and the latter at an Econo Lodge. During the call, Adkins and Timmons discussed Timmons's drug debt to Chico, with Timmons promising, "We can count it up and everything," J.A. 182. Timmons also inquired about the arrival of the new shipment of cocaine, "Um, everything good?", J.A. 181. These calls were recorded by the agents. Adkins offered to the agents physical descriptions of Everett and Timmons and descriptions of the make, model, and color of the automobile each would be driving. Adkins explained that Everett and Timmons would be carrying large sums of cash and that Everett would be armed as usual, especially because he had recently been shot in the leg.

Timmons arrived in the described vehicle at the Econo Lodge that evening, and was arrested by county drug task force members upon exiting the car. The officers found approximately $1,000 on Timmons's person. Shortly thereafter, a county detective drove

---

[2]Timmons owed either $5,000 or $15,000 for the past shipment, but Adkins could not recall which number Chico specified during the telephone conversation.

Timmons's vehicle to the Best Western, a seve- to ten-minute drive. The county detective transferred control of the vehicle to a DEA agent, who then searched it. The DEA officer found about $20,000 in cash wrapped in rubber bands. He also found a digital scale in the center console with a white powdery substance on it.

A few hours later, Everett arrived at the Best Western in a vehicle with two other persons. Everett was in the back seat, and a .45-caliber pistol was in the seat pocket in front of him. Everett was arrested and his cell phone, $600 in cash, and an ounce of cocaine were confiscated from his person. The phone had stored Adkins's and Timmons's numbers in the recent-calls list. A search of the vehicle revealed the firearm and $14,000 in cash.

Timmons and his girlfriend Tamara Yvette Simmons ("Simmons") testified at trial as to an alternative explanation for the physical evidence and the events surrounding his arrest. Timmons claimed that he was starting a courier business with Simmons, and that he was carrying such large amounts of cash upon arrest because he and Simmons were planning on buying two vehicles for the new business from a car lot across the street from the Econo Lodge. He also admitted to being in business with Adkins, but insisted the business was one to sell National Football League ("NFL") "throwback" jerseys.[3] Timmons explained that, during his telephone

---

[3]These are replicas of certain jerseys worn by NFL players that display outdated designs and color schemes.

conversations with Adkins that day, Timmons did not arrange for a meeting with Adkins but simply informed him as to his whereabouts for the evening. Timmons also explained that he was referring to throwback jerseys when he said, "We can count it up and everything." Timmons testified that $15,000 of his cash came from an uncle in New York who had just received a severance check of about $19,000. Timmons claimed that he used the digital scale to aid in his personal consumption of cocaine. Finally, Timmons testified that he did not know that Everett would be carrying a gun on the night of his arrest.

To rebut Timmons's account, the government introduced the testimony of Wendell Tyrone Ford ("Ford"), a member of a previous and uncharged drug-trafficking conspiracy with Timmons and Everett. Ford testified that he sold powder and crack cocaine to Timmons and Everett for resale over a period of several months in 2000 and 2001. Ford testified that Timmons was a "frequent and reliable customer," J.A. 581, who would resell the drugs in Timmons's apartment complex. Ford also testified that he noticed Everett in possession of a .45-caliber firearm during one drug transaction.

While the trial was proceeding, one juror wrote a letter to the district court judge asking her to forward to Timmons a letter dealing "strictly [with] personal matters outside of this case" along with a Bible. J.A. 780. The letter to Timmons contained quotations from the Bible and a summary of the central tenets of

6

Christianity, including the sinfulness of all persons, J.A. 782 ("All of us are guilty before God"), the attendant unworthiness of man, id. ("The sin needs to be punished"), and the atoning interposition of Jesus, id. ("[God] bridged the gap that our sin created by sending . . . Jesus"). The letter indicated that its "sole purpose" was "to tell [Timmons] that God loves [him]," and that its author wrote it "with an open mind of the outcome" of the case. J.A. 781.

After the close of evidence but before the jury's deliberations, Timmons moved to reopen his case to introduce a faxed copy of his uncle's cancelled severance check for $19,000 that was the alleged source of $15,000 of the cash in Timmons's possession upon his arrest. The district court declined to reopen the case because there was insufficient justification for the delay in procuring the evidence.

The jury returned a guilty verdict on both counts. Immediately after the verdict was read, the district court conducted a voir dire of the juror who had written the letter to determine whether her religious views improperly biased her or any other juror. The juror stated that she had asked her fellow church members to pray for Timmons, though not by name, and that her religious beliefs did not influence her decisions in the case. She insisted that the "sin [that] needs to be punished" mentioned in her letter was original sin, not a characterization of Timmons's

7

particular actions revealed during the trial. She also stated that she showed the letter to another juror on the last day of trial. The district court then conducted a separate voir dire of the juror who had read the letter, who told the court that neither the letter nor the conversation influenced her decisions. The district court finally conducted a voir dire with the entire jury, questioning the Foreperson and the jury en masse as to whether any juror's religious views were discussed during deliberations and whether any other juror was made aware of the letter. Because the Foreperson answered in the negative, and because the district court found no bias or prejudice, the court entered the verdicts and denied Timmons's later motion for a new trial based on juror misconduct.

Finally, prior to sentencing, the government filed an information pursuant to 21 U.S.C. § 851(a) indicating that Timmons previously had been convicted of a narcotics offense. Timmons filed a written response to the information, contending that it would be constitutional error to enhance his mandatory minimum sentence based on the prior conviction because there was insufficient proof that Timmons had counsel during the prior proceedings.[4] The district court rejected Timmons's argument and imposed the mandatory minimum sentence of 300 months' imprisonment for the two counts.

---

[4]This argument was abandoned on appeal.

Timmons timely appealed, raising several arguments. We discuss each in turn.

## II.

Timmons first argues that there was insufficient evidence to support his conviction on either count. A jury verdict must be sustained against such a challenge if "there is substantial evidence, taking the view most favorable to the Government, to support it." Beidler, 110 F.3d at 1067 (internal quotations omitted). We first discuss the evidence supporting the conspiracy count, then that supporting the firearm possession count.

## A.

To prove conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846, the government "must establish that: (1) an agreement to possess cocaine with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy." United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996).

Timmons contends that the evidence showed only that he and Adkins shared a buyer-seller relationship, not "an agreement to possess cocaine with intent to distribute," id. Viewing the evidence in the light most favorable to the government, we find

9

substantial evidence to support a finding that Timmons's involvement went beyond that of a buyer. Adkins specifically testified as to his and Timmons's involvement with Chico, including Chico's orchestrating the details of the distribution of the cocaine in Virginia and choosing the house in which the drugs should be stored pending resale. Adkins's testimony that Timmons was slated to purchase and resell several kilograms of cocaine, as he had done several times before, is also inconsistent with personal use. See United States v. Brown, 332 F.3d 363, 373 (6th Cir. 2003) ("[E]vidence of repeat purchases provides evidence of more than a mere buyer-seller relationship."); United States v. Bourjaily, 781 F.2d 539, 545 (6th Cir. 1986) ("A large volume of narcotics creates an inference of a conspiracy.").

Timmons also argues that even if an agreement to distribute cocaine existed, no legal conspiracy arose because Adkins was acting as a government agent on the night of Timmons's arrest. This argument misunderstands the nature of the charged conspiracy. The conspiracy was not, as Timmons suggests, a one-time agreement to distribute the eleven kilograms of cocaine in the instant shipment. It was, rather, a long-term association among Adkins, Chico, Everett and Timmons to distribute cocaine, in furtherance of which this shipment was the eighth such delivery. The conspiracy, then, clearly predated Adkins's capture by law enforcement. Furthermore, even if Adkins was a government agent during the

10

conspiracy, Chico and Everett were not.  Thus, the agreement "existed between two or more persons," Burgos, 94 F.3d at 857, and is an adequate predicate for a conspiracy charge.[5]

## B.

Timmons also challenges the sufficiency of the evidence to support his firearm conviction under 18 U.S.C. § 924(c).  Indeed, no evidence was presented to show that Timmons personally possessed a firearm in furtherance of the conspiracy.  The government nevertheless argues that Timmons bears responsibility for Everett's possession of a firearm on the night of the arrests under the rule articulated in Pinkerton v. United States, 328 U.S. 640, 645 (1946).

A conspirator "may be convicted of substantive offenses committed by co-conspirators in the course of and in furtherance of the conspiracy."  United States v. Chorman, 910 F.2d 102, 111 (4th Cir. 1990) (describing so-called Pinkerton liability).  In particular, "[a] defendant may be convicted of a § 924(c) charge on the basis of a coconspirator's use of a gun if the use was in furtherance of the conspiracy and was reasonably foreseeable to the defendant."  United States v. Wilson, 135 F.3d 291, 305 (4th Cir.

---

[5]Timmons also attacks on appeal the credibility of Adkins and Ford.  However, "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented."  United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994).  We find no reason to disturb the jury's credibility determinations here.

11

1998).  Timmons contends that <u>Pinkerton</u> liability may not attach here because Everett's use of the firearm was not in furtherance of the conspiracy and was not foreseeable to Timmons.

Timmons argues that Everett carried his firearm on the night of the arrests for personal protection, not to further the conspiracy.  To support his contention, Timmons points to the fact that Everett had been shot shortly before the arrests.  There was evidence before the jury, however, that Everett was carrying over $14,000 in cash and intended to leave the Best Western with large quantities of cocaine for resale.  The jury reasonably could have inferred that Everett carried the firearm to protect the cash and cocaine.  "[I]f the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." <u>Murphy</u>, 35 F.3d at 148.  We decline to intrude upon the province of the jury and conclude that the jury reasonably found that Everett carried the firearm in furtherance of the conspiracy.

Timmons also argues that he could not reasonably have foreseen that Everett would carry a firearm in furtherance of the conspiracy.  Adkins and Ford, however, both testified that they knew that Everett had carried a firearm during past drug transactions.  Adkins and Timmons also testified that they knew that Everett had recently been shot.  Finally, Adkins and a DEA agent both testified to the prevalence of firearm-use in the drug trade.  We find this aggregated evidence to be more than sufficient

12

to support the jury's finding that Timmons could reasonably have foreseen that Everett would use a firearm in furtherance of the conspiracy.

In sum, because "[r]eversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear," Beidler, 110 F.3d at 1067 (internal quotations omitted), and the government presented "substantial evidence . . . to support" the jury verdict here, id., we reject Timmons's challenge to the sufficiency of the evidence to support his convictions.

III.

Timmons next argues that the search of his automobile after his arrest violated his Fourth Amendment right to be free from unreasonable searches and seizures, and that the district court therefore erred in denying his motion to suppress the evidence obtained from the search. "In considering a ruling on a motion to suppress, we review conclusions of law de novo and underlying factual findings for clear error." United States v. Buckner, 473 F.3d 551, 553 (4th Cir. 2007) (emphasis omitted).

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." Maryland v. Dyson, 527 U.S. 465, 466 (1999). Any evidence obtained in violation of the Fourth Amendment may be suppressed under the exclusionary rule. United States v. Perez, 393 F.3d 457, 460 (4th Cir. 2004). A warrantless

13

search is nevertheless valid, and the evidence obtained from the search admissible, if the search "'falls within one of the narrow and well-delineated exceptions' to the Fourth Amendment's warrant requirement." United States v. Currence, 446 F.3d 554, 556 (4th Cir. 2006) (quoting Flippo v. West Virginia, 528 U.S. 11, 13 (1999)).

One such exception is that allowing a warrantless automobile search incident to arrest. See New York v. Belton, 453 U.S. 454, 460 (1981). Timmons argues at length that the circumstances of the instant search do not fit the confines of the Belton exception. We need not consider the applicability of Belton to these facts, however, because we find that a separate exception--allowing a warrantless search of an automobile with probable cause--remedies the absence of a warrant.

Under the so-called "automobile exception" to the warrant requirement, a finding of probable cause that a vehicle contains contraband alone allows a warrantless search of the vehicle. Dyson, 527 U.S. at 467. This court recently applied this exception to facts not meaningfully distinguishable from those surrounding Timmons's arrest. See United States v. Dickey-Bey, 393 F.3d 449, 456-57 (4th Cir. 2004).

In Dickey-Bey, the defendant was arrested as he picked up a package containing cocaine from a local Mailboxes, Etc. store. Id. at 450. The arresting officer confirmed that the defendant's

14

physical description matched that of the person who regularly picked up packages from the mailbox in question.  Id. at 452. Because the package was known to contain drugs, the defendant had acted suspiciously in the parking lot before picking up the package, and the defendant had been seen picking up similar packages in the past, the court held that the arresting officers had probable cause to believe that the automobile "was an instrumentality of the crime."  Id. at 456-57.  As such, the warrantless search was held to be permissible under the automobile exception.  Id. at 457.  The court noted that it "need not . . . decide whether the search of [the] automobile was properly incident to his arrest" because it instead found that the automobile exception applied.  Id. at 456.

As in Dickey-Bey, the searching officer here had probable cause to believe that Timmons's automobile "was an instrumentality of the crime" of conspiracy to possess cocaine with intent to distribute.  See id. at 457.  Adkins had offered a physical description of Timmons and of the automobile he would be driving on the night of his arrest.  He had also indicated that Timmons would be carrying a large sum of cash to repay his debt to Chico for a prior shipment.  Finally, Adkins explained that Timmons planned to leave the hotel with a quantity of cocaine for resale.  This information, known to the arresting and searching officers, constituted probable cause to believe that Timmons's automobile was

15

"an instrumentality of the crime" of conspiracy.  Therefore, we find that the warrantless search of Timmons's automobile was valid under the automobile exception to the warrant requirement.

IV.

Next, Timmons contends that the district court abused its discretion in two respects: first, in allowing the jury verdict to stand even though a juror expressed strongly held religious beliefs about sin and punishment, and second, in declining to allow him to reopen his case to introduce further evidence.  We discuss each argument in turn.

A.

Timmons argues that the district court erred by not granting his motion for a mistrial based on the conduct of the authoring juror.  We review for abuse of discretion the denial of a motion for a mistrial based on allegations of juror misconduct.  <u>United States v. O'Neal</u>, 180 F.3d 115, 118 (4th Cir. 1999).

Timmons's counsel conceded at oral argument that the district court did not err in its response to receiving the letter from the juror--that is, in separately conducting a voir dire of her, the juror to whom the letter was shown, and then the entire jury. Instead, Timmons insists that the proffered letter revealed on its face that the authoring juror was impermissibly biased against

16

Timmons and that no amount of process could be sufficient to rebut the clear implication of the letter's text.

Timmons does not cite any authority for his suggested rule that would find per se bias in the juror's conduct. On the contrary, the letter itself contains statements that tend to disprove any bias. See, e.g., J.A. 781 (indicating that the "sole purpose" of the letter was "to tell [Timmons] that God loves [him]," and that its author wrote it "with an open mind of the outcome" of the case); id. (stating that "God loves you. Regardless if you are found innocent or guilty in this courtroom"). Even if the letter could be read to reflect a possible bias against Timmons, the existence or nonexistence of bias was appropriately probed by the procedures employed by the district court--procedures Timmons himself conceded were proper. We therefore cannot say that the district court abused its discretion in denying Timmons's motion for a mistrial based on juror misconduct.

B.

Timmons also contends that the district court erred by declining to allow Timmons to reopen his case to introduce into evidence a faxed copy of his uncle's cancelled severance check. We review for abuse of discretion a district court's refusal to reopen a case to allow new evidence. United States v. Abbas, 74 F.3d 506, 510-11 (4th Cir. 1996). In conducting such a review,

> we examine (1) whether the party moving to reopen
> provided a reasonable explanation for failing to present

17

the evidence in its case-in-chief; (2) whether the evidence was relevant, admissible, or helpful to the jury; and (3) whether reopening the case would have infused the evidence with distorted importance, prejudiced the opposing party's case, or precluded the opposing party from meeting the evidence.

Id. at 511. The party that sought to introduce new evidence must establish all three factors to prevail on appeal. Id.

Focusing on the first factor, Timmons's counsel explained to the district court that he had been appointed only a month before the trial after Timmons's first attorney was removed because of the discovery of a conflict of interest. Due to the late change in representation, Timmons argued, he did not have sufficient time to recover a copy of the cancelled check. The district court rejected this explanation, finding that there should have been "no surprises" about the primary issues in the trial, especially considering that the check's pertinence "came from [Timmons's] side of the podium, not the government's." See J.A. 634, 36. Indeed, the copy of the check was relevant, if at all, in connection with Timmons's primary defense--that he borrowed the large sums of cash (as opposed to receiving them from drug deals) and was planning on purchasing automobiles (as opposed to more drugs for resale). See J.A. 634. The court concluded that "there's really no reason why there would not have been documentation that could have been timely provided." J.A. 635.[6]

---

[6]We also question whether Timmons could satisfy the second Abbas factor, considering the number of inferential steps required

18

As the district court aptly noted, "This case could go on forever. The same way overnight, the government could come in with [further supporting evidence]. . . . [T]here's a point of finality here." J.A. 634. Because Timmons did not proffer a satisfactory explanation for the delay in producing the evidence, we find that the district court did not abuse its discretion in declining to allow Timmons to reopen his case.

V.

Finally, Timmons argues that by failing to afford him a so-called § 851(b) colloquy, the district court erred and his sentence must be vacated. Timmons failed to raise this issue before the district court, and we therefore review for plain error. United States v. Ellis, 326 F.3d 593, 598 (4th Cir. 2003).

Whenever the government seeks to enhance a defendant's sentence by virtue of a prior conviction, it is required to "file[] an information with the court . . . stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1). Section § 851(b) operates in tandem with § 851(a), providing that once a § 851(a) information has been filed,

> the court shall after conviction but before pronouncement of sentence inquire of the person with respect to whom the information was filed whether he affirms or denies

to connect a copy of the uncle's cancelled check from New York to wads of twenty-dollar bills in the back of Timmons's vehicle in Virginia.

19

that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence.

§ 851(b). In addition, if the defendant "denies any allegation of the information . . . , or claims that any conviction alleged is invalid, he shall file a written response to the information." § 851(c)(1).

Here, the government filed a § 851(a) information forecasting that it would seek an enhanced sentence based on Timmons's prior felony conviction for possession of cocaine with intent to distribute. The government concedes, however, that the district court neither "inquire[d] of [Timmons] whether he affirm[ed] or denie[d]" the prior conviction nor "inform[ed] him that any challenge to [the] prior conviction which [wa]s not made before sentence [wa]s imposed may not thereafter be raised to attack the sentence." See § 851(b). Nevertheless, the government argues that "the substantive protections underlying that subsection were provided to [Timmons] in this case," United States v. Campbell, 980 F.2d 245, 252 (4th Cir. 1992).

In Campbell, as here, the government filed a § 851(a) information, but the district court never conducted a § 851(b) "colloquy in which [it] specifically addressed each of the issues" listed. 980 F.2d at 252. The court identified the purpose of § 851(b) as "provid[ing] the defendant with a full and fair

20

opportunity to establish that he is not the previously convicted individual or that the conviction is an inappropriate basis for enhancement under section 841." Id. Because the defendant filed a § 851(c) motion "argu[ing] that the conviction did not qualify for sentencing enhancement purposes," he must have "appreciated his right to challenge the state conviction." Id. The district court's subsequent "lengthy hearing on th[e] issue" raised by the defendant, the Campbell court held, effectively afforded him the procedural protections of § 851(b). Id.

Similarly, here, Timmons filed a § 851(c) motion in which he "argued that the conviction did not qualify for sentencing enhancement purposes," id., because there was insufficient evidence that he was represented by counsel at the time of the conviction. As in Campbell, the district court here held a "lengthy hearing on this issue," id., ultimately ruling against Timmons's challenge. Because Timmons's argument is thus similar in all relevant respects to that rejected in Campbell, we likewise find that Timmons "appreciated his right to challenge the state conviction" and "conclude that the substantive protections underlying that subsection were provided to [Timmons] in this case," Id.[7]

---

[7]In his pro se brief, Timmons also contends that he was denied effective assistance of counsel in violation of the Sixth Amendment. He argues that his trial counsel was constitutionally deficient in failing to insist that the questions of the amount and type of drugs possessed be submitted to the jury. See United States v. Milam, 443 F.3d 382, 387 (4th Cir. 2006). Both questions were in fact, however, submitted to the jury and answered on the

21

VI.

For the foregoing reasons, Timmons's convictions and sentence are

AFFIRMED.

---

verdict form.  Timmons also argues that his sentence should not have been enhanced for obstruction of justice when such a charge was neither included in his indictment nor submitted to the jury. Such judicial fact-finding cannot be error, however, because the district court imposed the statutory minimum sentence for each conviction.  See United States v. Burgess, 478 F.3d 658, 661 n.2 (4th Cir. 2007).